HENRY C. PITNEY, JOHN R. EMERY, ALFRED REED,
FREDERIC W. STEVENS, MARTIN P. GREY AND
EUGENE STEVENSON, VICE-CHANCELLORS.

---

THERESA G. SEELEY, petitioner,

*v.*

CHARLES G. SEELEY.

[Filed November 26th, 1902.]

1. In actions for divorce which are undefended, the master to whom the matter is referred acts as a judicial officer of the court and should require the examination of witnesses to be conducted in accord with the ordinary rules for the production of evidence in judicial proceedings; if he dis-

·1

Seeley *v.* Seeley.

covers an inclination to evade disclosure of the truth, he may, because of the interest of the public in proceedings for the dissolution of marriage, search the memory and conscience of the witness by leading questions, but an examination, by counsel of the party seeking divorce, respecting the very ground relied on for relief by questions of a suggestive and leading character, should be restrained by the master and evidence thus elicited should be accorded but little, if any, weight in making up his conclusion.

2. The ground on which relief was sought in this case was that of constructive desertion of petitioner by her husband. Her claim was that she had left home because prior to the birth of her first child he had attempted, by violence, to produce an abortion upon her, which brought about a premature delivery of the child who lived, and because he had, previous to the time of her leaving him, threatened to again attempt abortion if she became pregnant. There was no corroboration either as to the criminal act charged or as to the alleged threats.—*Held,* that a case for divorce had not been made out.

On application for decree on master's report.

*Mr. Enoch A. Higbee,* for the petitioner.

MAGIE, CHANCELLOR.

The petition in this case bases the right of petitioner to a decree of divorce upon a constructive desertion of her by her husband, the defendant. The charge in the petition is that by reason of his failure to provide her a suitable home in accordance with his means, and because of his extreme cruelty, whereby the health and life of the petitioner were in danger, she was obliged to leave him.

No defence having been presented, the usual order of reference was made. The master's report was in favor of a decree of divorce. An examination of the proofs taken by the master and returned with his report has required the conclusion that the report cannot be confirmed.

It is elementary law with us that a decree of divorce will not be made on the uncorroborated evidence of a petitioner.

If the law were otherwise, and if this court could dissolve a marriage upon the uncorroborated testimony of one who seeks such relief, it would be doubtful if a case for relief would be made out on petitioner's testimony.

To sustain her charge of cruelty petitioner testified that, having been married on February 17th, 1897, her husband, on July 22d, following (she being then pregnant), attempted to produce an abortion upon her, by violence and against her consent, with the result that on the next day she was prematurely delivered of a child, which is yet living. The act of defendant was not only a gross violation of his duty to petitioner, but was also a detestable crime. Yet petitioner did not complain of his criminal conduct, nor did she then leave the defendant. She further testified that, after the birth of that child, defendant attempted to kill it, and threatened to do so. Nor did she then leave the defendant. On the contrary, she continued to live with him as his wife until January 25th, 1898. She then left him, and has continued since to live apart from him.

When the master asked the petitioner to state the cause of her leaving him at that time, this was the answer made:

"Things had been unbearable so long I couldn't stand it any longer, so I left at that time because just along at that time he had been going out at night, and if I would ask him where he was going he would tell me none of my business. If I would ask him when he would be home he would say, 'Maybe he would go to hell, he didn't know where he would go,' and I asked him for a morning paper on the day I left—I didn't expect to leave just then, and I went in and asked for a morning paper, and he said, 'he had nothing to give me,' and I asked him to sell me one, and he said, 'he didn't have anything to give or sell me,' and then I was broken down in health and at that time I thought I was pregnant—for this other child I had—and he said if you ever have another child that he would perform an abortion, the same as he did once, and I was afraid to tell him. I was afraid of my life. He told me that he would kill me or kill the child, and so, altogether, I had to come home."

If the examination had terminated at that point, it is obvious that the testimony would not have justified the conclusion that petitioner had left her husband because of any then attempted violence endangering her life or health or that she had grounds for apprehension of immediate violence. In the list of causes stated, most of which were of trivial character and insufficient to make her leaving him a desertion by him, was one relating to threats by him that, if she became pregnant, he would perform an abortion upon her. There is nothing to indicate that the

threats were then made, for she did not then tell him of her belief that she was then pregnant, because she feared to do so. But on January 25th, 1898, she could have had no assured ground for believing that she was then pregnant, because her second child was not born until October 19th, 1898. On January 25th the present or apprehended danger was no other or greater than had existed from the time of the alleged attempt at abortion or murder.

But the examination was continued and conducted in a manner which deserves criticism. After the master had properly asked petitioner to testify to the cause of her leaving her husband, and she had responded by enumerating a number of causes, mingling together those which were trivial and that which was substantial, if proved, he permitted her counsel to elicit evidence from her by prolonged and repeated questionings of a leading and suggestive character, which culminated in this extraordinary question, "Then do I understand that this cruelty and abuse of you was so great that you were obliged to take your child and leave him, in order to save your life and the child's life?" to which question the petitioner naturally answered, "Yes."

In actions for divorce which are undefended a peculiar responsibility is imposed on the court. Such a proceeding deals with a personal relation of vast importance, not only to the parties, but to the public. A decree dissolving the marriage tie will not be made by the consent or acquiescence of the parties. If no defence is interposed, there is no decree *pro confesso,* but the matter is referred to a master, as a judicial officer of the court, with direction to ascertain and report as to the truth of the charges made in the bill or petition, with his opinion thereon. To enable him to perform that duty, the party seeking divorce is ordered to take depositions and other evidence before the master to prove such charges.

Before the master, sitting for the court, the solicitor should produce his witnesses and examine them in accordance with the ordinary rules. If the master discovers that a witness is inclined to evade disclosure of truth, I have no doubt that it would be his duty to search the memory and conscience of the witness by

Seeley *v.* Seeley.

questions of a leading character, and this because of the interest of the public in such a cause.

But where a petitioner or a complainant is a witness it is an abuse of the solicitor's privilege to elicit from his client evidence touching the very *crux* of the case by suggestion. Such a course may well be rebuked by the master, and evidence so elicited should be accorded but little, if any, weight.

In no case could the rule requiring corroborating evidence in support of petitioner's testimony be more properly applied than in one of this character. Petitioner's charges are based upon an alleged criminal act of her husband in attempting abortion, the result of which was a premature birth due to his act. Some corroboration might be derived from the doctor who attended petitioner or those about her at the time of her delivery. No person was called or examined upon that matter. An examination of the testimony discloses absolutely no corroborative evidence. The testimony of petitioner's mother, that the petitioner's first-born child, seen by her some four or five days after birth, was small and apparently of premature birth, is not corroborative of the acts which underlie the petitioner's claim, the criminal conduct of defendant in connection with the birth of that child. Petitioner's evidence of the horrible crime charged against defendant stands wholly without support from other evidence, and the case clearly showed that other evidence was available.

The result is that the report of the master should not be confirmed and the petition should be dismissed.